Troy, Paul E., J.
This matter came before the court on the motion of the defendant, Victor Martinez (Martinez), to suppress evidence seized pursuant to a search warrant. The defendant challenges the sufficiency of the search warrant on the ground that there was insufficient information to establish a nexus between the criminal activity — trafficking in cocaine— and the place to be searched — his home. The defendant also seeks to suppress all evidence seized from his person during a stop effectuated .12 miles away from his home directly prior to the execution of the search warrant, arguing that the warrant did not provide the police with the authority to conduct such a stop. For the reasons discussed below, the defendant’s motion is DENIED.
BACKGROUND
Detective George Khouiy (Det. Khoury) of the Brockton Police Department submitted the following information in an affidavit in support of his application for a search warrant for 875 N. Main Street, apartment 3 in Brockton, and for a Mazda Millenium bearing Massachusetts Registration 14TB55.
On March 21, 2007, Det. Khoury spoke with a confidential informant (Cl) who stated that it had been purchasing $20 bags of crack cocaine from a Hispanic male known as Flaco — later identified as Martinez. The Cl has provided Det. Khoury with information, and made controlled buys, in the past. The past information and buys led to two arrests. The charges against the arrested individuals are currently pending in Brockton District Court. The Cl told Det. Khouiy that when it purchased the cocaine from Martinez, it called Martinez at the cellular telephone number 508-562-9837, told Martinez how much cocaine it wanted, and Martinez directed it to a meeting place where the sale was consummated. The Cl stated that Martinez lives at 875 N. Main Street, that he drives a small gold-colored car, and that the Cl has seen Martinez’s car at that location. According to National Grid records, Martinez is billed for utilities at 875 N. Main Street.
On April 5, 2007, the Cl made a controlled buy of crack cocaine from Martinez. Prior to the buy, Det. Khouiy searched the Cl, who did not have any narcotics or money on its person. The Cl then dialed the cellular phone number 508-562-9837, made arrangements to purchase the drugs, and was directed to a meeting place. Det. Khoury provided the Cl with money and the Cl went to the meeting place. Det. Khoury conducted surveillance of the Cl as it traveled to the meeting place. Detective Diliddo (Det. Diliddo) observed a 2000 brown Mazda Millenium bearing Massachusetts Registration 14TB55 pull into the meet location. According to Massachusetts Registry of Motor Vehicles records, the Mazda is registered to Martinez at the N. Main Street address. Det. Khouiy observed the Cl walk over to the driver’s side window of the vehicle and conduct a drug transaction. The Cl then walked away from the car and returned to Det. Khouiy. The Cl handed Det. Khouiy a quantity of crack cocaine — following the controlled buy, Det. Khoury brought the substance sold to the Cl to the police station where it was tested and showed a positive response for cocaine. The Cl also stated that Martinez had been driving the car and that there was a Hispanic male in the passenger seat whom it did not know. Det. Diliddo and Detective Keating (Det. Keat-ing) followed the Mazda from the meeting place to 875 N. Main Street. Officer Diliddo then observed the operator, whom he later identified as Martinez,[1] exit the car. The passenger also exited the car. Both men entered 875 N. Main Street.
On April 9, 2007, the Cl made a second controlled buy from Martinez. Prior to the buy, Det. Khoury searched the Cl, who did not have any narcotics or money on its person. The Cl then dialed the cellular phone number 508-562-9837, made arrangements to purchase the drugs, and was directed to a meeting place. Det. Khoury provided the Cl with money and the Cl went to the meeting place. Det. Khouiy conducted surveillance of the Cl as it traveled to the meeting place. Approximately five minutes after the Cl called Martinez, Det. Keating observed Martinez and an unidentified Hispanic male exit 875 N. Main Street and get into the Mazda.[2] Det. Keating, Det. Diliddo, and Detective Stanton (Det. Stanton) followed the Mazda as it traveled to the meet location. Det. Khoury observed the Mazda pull into the meet location, saw the Cl walk up to the driver’s side window, and watched the drug transaction. The Cl then walked away from the car and returned to Det. Khouiy. The Cl handed Det. Khouiy a quantity of crack cocaine— again, following the controlled buy, Det. Khouiy brought the substance sold to the Cl to the police station where it was tested and showed a positive response for cocaine. The Cl also stated that Martinez had been driving the car and that there was a Hispanic male in the passenger seat whom it did not know. Dets. Diliddo, Keating, and Stanton followed the Mazda as it left the meeting location and traveled directly to 875 N. Main Street. Det. Diliddo then observed Martinez and the Hispanic male exit the car and enter 875 N. Main Street.
On April 17, 2007, Det. Khouiy spoke with the Cl, who told him that it had purchased crack cocaine from Martinez earlier that day and that Martinez had been driving the Mazda.
That same day, Det. Khouiy submitted his application for a search warrant. A magistrate judge issued the search warrant and, on April 19, 2007, at approximately 5:00 p.m., Brockton police officers prepared to execute the warrant. At 5:35 p.m., Det. Khoury observed Martinez leave 875 N. Main Street, walk toward Wilmington Street, cross Wilmington Street, and get into an Audi with two other occupants. Martinez was approximately .12 miles from his house *249 at this time. As Martinez entered the Audi, Det. Pierce stopped him and conducted a pat frisk. The following items were located on Martinez’s person: a wallet containing $300; a Nextel phone; and $1,079, located in Martinez’s right front pocket. Det. Pierce brought Martinez back to 875 N. Street, took Martinez’s keys from his person, and opened the door to the building. The detectives then walked up to Martinez’s apartment, announced themselves, and used Martinez’s key to open the apartment door. Det. Williams sat Martinez down on a couch in the apartment and read him his Miranda rights, which Martinez stated that he understood.
Det. Pierce then observed a small clear plastic bag of crack cocaine on Martinez’s sweatshirt. When he asked Martinez where it had come from, Martinez stated that he had spit it out of his mouth and admitted that he had spit out additional bags, which he had stuffed under the couch cushion. Five similar bags were found under the cushion. Martinez also informed the detectives that there was a .38 firearm under the bed and crack cocaine in the top drawer of the nightstand, both of which the police recovered.[3] The following items were also located inside the apartment: a box of fifty shells and .38 caliber ammunition; a white plate with crack cocaine and a razor on it; a digital scale; a grey cellular phone with the number 508-562-9837; cut baggies in the kitchen trash; and a box containing cut and torn baggies. Additionally, paperwork addressed to Martinez was found located throughout the bedroom. The police also searched the Mazda, but the search yielded nothing.
DISCUSSION
I. Probable Cause to Issue the Warrant
The defendant asserts that the affidavit in support of the search warrant lacks probable cause because it fails to establish a nexus between the criminal activity alleged and the place to be searched. When evaluating the defendant’s argument, the court’s inquiry as to the sufficiency of the search warrant begins and ends with the four comers of the affidavit. Commonwealth v. O’Day, 440 Mass. 296, 297 (2003). To establish probable cause, the search warrant affidavit must contain sufficient information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that the items reasonably may be expected to be located in the place to searched at the time the warrant issues. Commonwealth v. Stegemann, 68 Mass.App.Ct. 292, 299 (2007). The connection between the items to be seized and the place to be searched does not have to be based on direct observations; rather, it may be found by looking at the type of crime, the nature of the items, the suspect’s opportunity to conceal items, and the inferences as to where the items are likely to be hidden. Commonwealth v. Olivares, 30 Mass.App.Ct. 596, 600 (1991).
The Appeals Court has recently held that a search warrant affidavit sets forth the requisite nexus between a defendant’s illegal drug activity and his residence where the affidavit provides information that is virtually the same as the information Det. Khoury provided in the affidavit at bar. See Commonwealth v. Pina, 71 Mass.App.Ct. 653, 656-57 (2008). In Pina, a confidential informant told a member of the New Bedford Police Department that it had been purchasing cocaine from Pina on an ongoing basis. Id. at 654. The informant also provided Pina’s address and the make, model, and registration of the automobile that Pina drove. Id. Subsequent investigation revealed that the car was registered to Pina, that Pina lived with his girlfriend at the address provided by the informant, and that Pina’s girlfriend was billed for the utilities at the provided address. Id. The informant told the police that, in order to purchase drugs from Pina, the informant would call a telephone number provided by Pina and Pina would designate a time and location at which the two would meet for the transaction. Id. at 654-55.
The police conducted surveillance of Pina and observed him entering and exiting the address provided by the informant on numerous occasions, and arranged a controlled purchase between the informant and Pina; the informant telephoned Pina to arrange a cocaine purchase and Pina instructed the informant to meet him at a predetermined location. Id. at 655. A New Bedford detective observed Pina leave his apartment after receiving the informant’s call and drive directly to the designated location. Id. Another officer observed Pina and the informant meet and then separate. Id. After the transaction, the informant turned the cocaine he purchased over to the police.[4] Id.
The Court found that Pina’s car and apartment were the most likely storage locations for Pina’s drug delivery and sales operation, id. at 658, holding that although either the apartment or the car could have conceivably served as the storage location, the information set forth in the affidavit was sufficient to establish probable cause to search both the apartment and the car, as the probable cause standard requires only that the items sought may reasonably be expected to be found in the place to be searched, not that the items necessarily willbe found there. Id. (a permissible inference in support of probable cause “need only be reasonable and possible; it need not be necessary or inescapable”). The Court went on to state that the police detective’s observations of Pina departing from his apartment immediately after receiving a telephone call from the informant and traveling directly to the location of the controlled purchase, consistent with the method followed in the informant’s prior purchases, was sufficient to establish the requite nexus between Pina’s illegal drug sales and his apartment. Id.
*250 Similarly, here, the Cl told Det. Khouiy that it had been purchasing $20 bags of cocaine from Martinez. The Cl also provided Martinez’s address, a description of Martinez’s car, and the car’s registration. Subsequent investigation revealed that the car was registered to Martinez and that Martinez was billed for the utilities at the provided address. Additionally, the Cl told Det. Khoury that in order to purchase drugs from Martinez, it would call a cellular telephone number and Martinez would designate a time and location at which the two would meet for the transaction.
The police arranged two controlled purchases between the Cl and Martinez. Prior to both of the purchases, the Cl telephoned Martinez to arrange a cocaine purchase and Martinez instructed the Cl to meet him at a predetermined location. After the first controlled buy, Dets. Diliddo and Keating followed Martinez’s car from the meeting place to 875 N. Main Street and saw Martinez and a Hispanic male passenger enter the building. During the second controlled buy, approximately five minutes after the Cl called Martinez, Det. Keating observed Martinez exit 875 N. Main Street and drive directly to the meet location. Det. Khoury officer observed the Cl walk over to the driver’s side and conduct a drug transaction. Dets. Diliddo, Keating, and Stanton followed Martinez’s car after the buy and observed Martinez drive directly back to 875 N. Main Street, exit the car, and enter the building with the Hispanic male passenger. After both buys, the Cl turned the cocaine over to the police who tested the substance and confirmed that it was cocaine.
For the same reasons set forth in Pina, the information set forth in the affidavit here was sufficient to establish probable cause. Specifically, the police detectives’ observations of Martinez departing from his apartment immediately after receiving a telephone call from the Cl and traveling directly to the location of the controlled purchase, consistent with the method followed in the Cl’s prior purchases, was sufficient to establish the requite nexus between Martinez’s illegal drug sales and the apartment.[5] See id. at 656-58. As such, the evidence recovered from Martinez’s apartment need not be suppressed.
II. Validity of the Stop
Second, Martinez contends that the Brockton Police exceeded the scope of the warrant when police officers stopped and searched him on Wilmington Street and brought him back to his apartment. Specifically, Martinez argues that the warrant did not provide legal justification for stopping him .12 miles from his home,[6] and thus all the evidence seized as a result of this stop, as well as the statements he made to the police following the stop and during the execution of the search warrant, should be suppressed as fruits of the poisonous tree.
The court need not determine whether the police had the authority to stop Martinez under the warrant because they had probable cause to arrest him based on the information provided in the affidavit in support of the search warrant. See Commonwealth v. Charros, 443 Mass. 752, 764-65 (2005). In Char-ros, the police obtained a search warrant for the defendant’s house based, in part, on controlled buys from the defendant by a confidential informant. Id. at 764-65. After obtaining the warrant, the police positioned themselves around the defendant’s home, intending to wait for him to leave the house and stop him as soon as he was out of view from his home.[7] Id. Shortly thereafter, Charros left his house and drove away in a white van. Id. at 754. The police stopped the van one mile away, handcuffed Charros, pat frisked him, and drove him back to his house, after which they executed the warrant. Id. Contraband was found on Charros’ person and in the house. Id. at 754-55. Charros sought to suppress the evidence, arguing that the police lacked sufficient authority to stop the van under the warrant.[8] Id. at 760. The Court agreed with Charros, but found that the evidence did not need to be suppressed because the information set forth in the affidavit in support of the search warrant — specifically the controlled buys conducted by the confidential informant — provided probable cause to arrest Charros, and thus the stop and subsequent search and detention were not unlawful. Id. at 764-65.
Similarly, here, the information provided in the search warrant affidavit detailing the controlled buys conducted by the Cl provided sufficient probable cause to arrest Martinez. See id. Because the officers had probable cause to arrest Martinez when they stopped him, the stop and subsequent search and detention were not unlawful and the evidence and statements obtained by the police as a result of the stop need not be suppressed. See Id.
ORDER
For the reasons discussed above, the defendant’s motion to suppress evidence seized pursuant to the search warrant and stop is DENIED.

 Det. Diliddo was shown a photo of Martinez and identified him as the operator of the vehicle.

 It is unclear whether the unidentified Hispanic male that accompanied Martinez during the second controlled buy was the same individual present during the first controlled buy.

 The police recovered a total of sixteen bags of crack cocaine from the top drawer of the nightstand.

 Field testing confirmed the substance to be cocaine. Id.

 The defendant attempts to distinguish this case from Pina by arguing that in Pina(l) the affiant police officer stated that delivery services described such as the one described in the affidavit operate for the purpose of keeping drug sales and deliveries away from the location where the drugs are stored; and (2) the presence of the passenger in the car introduces yet a third location in which the drugs could have been stored. Based on the overwhelming similarities between the facts set forth in Pina and the facts in the case at bar, however, the *251 court cannot conclude that these discrepancies result in a different outcome for Martinez.

 Martinez argues that the police officers could have executed the warrant earlier, or waited for him to return to the house.

 The officers took this course of action because they feared that someone inside the house might destroy evidence if Charros was stopped within view of the home. Id. at 759.

 Specifically, Charros argued that the officers were only authorized to detain him under the warrant if he was on the premises, and that the officers had no authority to seize him one mile from his home, return him to the home, and detain him inside while the officers executed the warrant. Id. at 759-60.