NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-1171                                          Appeals Court

COMMONWEALTH  vs.  JOSHUA LEWIS.

No. 21-P-1171.

Plymouth.     April 10, 2023. – August 3, 2023.

Present:  Milkey, Massing, & Henry, JJ.

Controlled Substances.  Search and Seizure, Affidavit, Fruits of
    illegal search, Hotel room, Probable cause, Reasonable
    suspicion, Warrant.  Constitutional Law, Search and
    seizure, Reasonable suspicion.  Probable Cause.  Practice,
    Criminal, Motion to suppress, Warrant, Affidavit.


Indictment found and returned in the Superior Court
Department on August 27, 2019.

A pretrial motion to suppress evidence was heard by Jeffrey
A. Locke, J., and a conditional plea of guilty was accepted by
William F. Sullivan, J.


Nancy Dolberg, Committee for Public Counsel Services, for
the defendant.
Joseph F. Janezic, III, Assistant District Attorney, for
the Commonwealth.


MILKEY, J.  Pursuant to a search warrant, the Brockton

police discovered "crack" cocaine in the defendant's hotel room.

He pleaded guilty to possessing a class B substance, while

reserving his right to appeal the denial of his motion to suppress the cocaine and other fruits of that search. Because we conclude that the affidavit submitted in support of the warrant supplied a sufficient nexus between the defendant's drug dealing activity and the location to be searched, we affirm.

Background. The affiant, a seventeen-year veteran of the Brockton police department, was contacted in April 2019 by a confidential informant (CI), who informed him that the defendant was selling crack cocaine out of an apartment in Brockton. Brockton Housing Authority officers confirmed that the tenant of the apartment was someone who had the same last name as the defendant, and who "always ha[d] friends and family member [sic] staying with him." As part of the investigation, the CI conducted two controlled "buys" from the defendant at the apartment. The controlled buys were arranged through the CI's calling a particular telephone number that the CI identified as belonging to the defendant. Based on these controlled buys, the officer obtained a warrant to search the apartment. However, when the officer went to execute the warrant, he learned from an unidentified source that the defendant had "moved out of" that apartment. The CI confirmed the defendant had "moved to the downtown area of Brockton," even though the CI had "no idea" of where the defendant specifically now was living.

Immediately thereafter, the officer received information from an unidentified source that the defendant now was staying in room 205 of a hotel in Brockton.  The officer had his CI contact the defendant, using the same telephone number as before, to arrange another controlled buy.  The CI was told by the "male" voice who answered the telephone to meet him at a particular location to purchase crack cocaine.  The police then observed the defendant leave the hotel on foot to travel to the agreed-upon location.  He was "under constant surveillance as he made his way over toward[]" that location, with the police losing sight of him only for what the officer characterized as "seconds."  After the controlled buy took place, the police observed the defendant directly return to the hotel (specifically in the direction of room 205).  As with the first two controlled buys, the officers followed the procedure set forth in Commonwealth v. Desper, 419 Mass. 163, 168 (1994), and the substance was field-tested positive for cocaine.

On May 1, 2019, the officer learned from the hotel's front desk clerk that the defendant had checked into the hotel on April 26, 2019, and confirmed that he in fact was staying in room 205.  After verifying the defendant's extensive drug-related criminal history, the officer on May 2, 2019, obtained a warrant to search that hotel room.  There, the police discovered, among other items, a plastic bag containing a hard

substance in seven individually wrapped portions and $694 in cash.

Discussion. "It is established that, in drug cases such as the present one, the affidavit accompanying a search warrant application must contain facts sufficient to demonstrate that there is probable cause to believe that drugs, or related evidence, will be found at the location to be searched." Commonwealth v. Pina, 453 Mass. 438, 440 (2009). "When that location is a residence, there must be specific information in the affidavit, and reasonable inferences a magistrate may draw, to provide 'a sufficient nexus between the defendant's drug-selling activity and his residence to establish probable cause'" (citation omitted). Id. at 440-441.

Determining the sufficiency of an affidavit is not an exercise in hermeneutics. Rather, its sufficiency "is to be decided 'on the basis of a consideration of all of its allegations as a whole, and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone.'" Commonwealth v. Jordan, 91 Mass. App. Ct. 743, 752 (2017), quoting Commonwealth v. Santiago, 452 Mass. 573, 576 (2008). "An affidavit need not show that evidence more likely than not will be found; it must provide merely that quantum of evidence from which the magistrate can conclude, applying common experience and

reasonable inferences, that items relevant to apprehension or conviction are reasonably likely to be found at the location" (quotations and citation omitted). Commonwealth v. Hayes, 102 Mass. App. Ct. 455, 462 (2023).

Turning to the case at hand, we begin by observing that the three controlled buys within a two-week period well established that the defendant was engaged in an illegal drug distribution operation "and had access to a supply for sale." Commonwealth v. Defrancesco, 99 Mass. App. Ct. 208, 212 (2021), citing Commonwealth v. Escalera, 462 Mass. 636, 646 (2012). As the affidavit also established, prior to the defendant's move, he was selling crack cocaine out of the apartment. After his move, the fact that the defendant travelled directly from the hotel to the site of the third controlled buy on foot and returned directly to the hotel thereafter provided the police a basis for believing that evidence of his illegal drug operation could now be found in his room there.[1] See Commonwealth v. Young, 77 Mass.

---

[1] We recognize that the hotel is a four-story structure that included an unspecified number of rooms. Here, however, the police confirmed with a hotel employee which room the defendant was residing in at the time of the affidavit. See Commonwealth v. Tapia, 463 Mass. 721, 726 n.9 (2012) (independent police work corroborated that defendant lived in specific apartment unit and made up for no direct observation of her entering or leaving that unit). See also Commonwealth v. Diaz-Arias, 98 Mass. App. Ct. 504, 508-509 (2020) (same). The defendant does not challenge the reliability of the front desk clerk's information (or, for that matter, the reliability of the unidentified other source(s) of information that the defendant had moved from the

App. Ct. 381, 387 (2010) ("defendant's routine of walking directly from his apartment to the point of sale, and returning to his apartment immediately following the sale, raised a reasonable inference that he kept a cache of drugs in his [residence], which served as a base of operations for drug sales that he conducted within walking distance of his residence").

To be sure, the cases establish that a single observation of a defendant leaving his residence to travel to a controlled buy, standing alone, is insufficient to establish a sufficient nexus to that residence. See Escalera, 462 Mass. at 643; Pina, 453 Mass. at 441-442. See also Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 493-495 (2020) (Henry, J., concurring) (collecting cases in Appendix). Here, however, there was additional support for the requisite nexus. See Escalera, supra at 644 ("A single observation of a suspect leaving his home for a drug deal may also support an inference that drugs will be found in the home where it is coupled with other information"). Most significantly, it is a reasonable inference that once the defendant moved from the apartment to the hotel, his room there

---

apartment to the hotel). Contrast Commonwealth v. Ponte, 97 Mass. App. Ct. 78, 85-86 (2020) (affidavit did not provide nexus to specific unit in apartment building that judge concluded could have had from twelve to thirty-six rooms, where confidential informant's veracity was not corroborated by independent police work).

became his base of operations.[2]  Before applying for the search

warrant, the Commonwealth corroborated that inference by the

third controlled buy, as the affidavit explained.

We emphasize that the establishment of a nexus between the

defendant's drug operations and the apartment where he likely

had been living and, in any event, had been operating his

business, does not relieve the Commonwealth from having to

demonstrate a nexus between his drug operations and his new

residence.  Indeed, the case law reflects a residence-by-

residence approach in which a search warrant affidavit must

establish a sufficient nexus for each place to be searched.  See

Commonwealth v. Dillon, 79 Mass. App. Ct. 290, 295-296 (2011)

(affidavit established probable cause to search one residence

but not other).[3]  However, where, as here, there is evidence that

_____

[2] We acknowledge that the affidavit did not expressly state
that the defendant had been living at the apartment prior to his
"move."  However, although our gaze is limited to the "four
corners" of the Commonwealth's application for a search warrant,
we may consider not only the averments directly set forth there,
but also any "reasonable inferences drawn from them."
Commonwealth v. Perkins, 478 Mass. 97, 102 (2017).  Moreover,
nothing in our analysis actually depends on whether the
defendant actually had been sleeping at the apartment or merely
using it as his base of operations.

[3] In Dillon, there was evidence that the defendant was
selling illegal drugs at a residential location in Lowell, but
actually lived at a second residence in Billerica.  Dillon, 79
Mass. App. Ct. at 291, 295-296.  We held that the affidavit
failed to establish a sufficient nexus to the Billerica
residence.  See id. at 297.  In Commonwealth v. Lima, 80 Mass.
App. Ct. 114, 116-117 (2011), we faced a similar context in

the defendant was conducting an illegal drug operation out of one residence, and then moved to another location from which he continued to provide an on-demand crack cocaine business using the same telephone number, nothing in our case law requires the police to ignore the earlier evidence and start over from a blank slate. To the contrary, existing case law recognizes that whether an affidavit has shown a reasonable likelihood that evidence of an illegal drug operation will be found at the place to be searched turns on a commonsense evaluation of the pattern of activity that has been documented. See Commonwealth v. Colon, 80 Mass. App. Ct. 162, 169 (2011) ("pattern of repeated activity giving rise to a reasonable inference that a dealer's residence is being used as the base for his drug operation provides sufficient nexus to search the residence" [citation omitted]). See also Defrancesco, 99 Mass. App. Ct. at 213.

We also acknowledge that the affidavit did not include certain details that the police appear to have known. For

_____

which a defendant was contemporaneously using two residences. The affidavit there established that the defendant was selling drugs out of a "stash house" but lived at a different location. See id. at 115. Under those facts, where even the affidavit "explicitly state[d] that the [defendant's actual residence] was unlikely to contain narcotics," we unremarkably concluded that observations that the defendant had left his residence immediately before, or returned to his residence after, engaging in drug sales at the stash house failed to establish probable cause that drugs would be found at his actual residence. See id. at 116-117.

example, the fact that the defendant was the nephew of the tenant of the apartment was absent.[4]  However, putting aside whether the police might have had good reason to exclude such details from the affidavit, the question is ultimately not whether the affidavit might have been made stronger, but whether it was sufficient to establish probable cause to search room 205.  See Andre-Fields, 98 Mass. App. Ct. at 486 ("absence of . . . information is not fatal to a determination of probable cause" where "[w]e give considerable deference to the magistrate's determination, and even 'the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants'" [citation omitted]).  On balance, reading the averments of the affidavit in their totality, together with the reasonable inferences that can be drawn from them, we conclude that the affidavit established probable cause that evidence of illegal drugs would be found in room 205 of the hotel, where the defendant was known to be residing at the time of the application for the warrant.  See Commonwealth v. Diaz-Arias, 98 Mass. App. Ct. 504, 509 (2020) (nexus can be "readily and 'practically' knowable or inferable from the extensive facts in the warrant affidavit").  The judge properly denied the motion to suppress.

---

[4] This fact came out at the hearing on the motion to suppress.

Order denying motion to suppress affirmed.

HENRY, J. (dissenting).  As the majority acknowledges, when it comes to searching a person's residence for drugs, our "case law reflects a residence-by-residence approach in which a search warrant affidavit must establish a sufficient nexus for each place to be searched."  Ante at   .  The majority then departs from that law by tacking activity from one residence -- actually, an apartment the majority infers was the defendant's "likely" residence, ante at   , -- to another residence, and it does so even though the defendant changed his modus operandi, switching from selling narcotics from his alleged home to a drug delivery service out of a hotel.[1]  I wrote separately in concurrence in Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 486 (2020), to "highlight the tenuously low showing to establish the requisite nexus to search a residence in a drug delivery service case, such as this one, where the confidential [informant] made no statement connecting the target premises to the drug activity."  Given the sanctity of a person's home, I do not agree that an intermediate appellate court should take such a drastic step to reduce constitutional rights.  This is particularly true here, where the affidavit in support of the

---

[1] "By 'drug delivery service case,' our cases have meant that the defendant operated in a manner to keep the drug transactions away from their home or target residence, typically where the transactions are arranged in advance with the buyer."  Commonwealth v. Andre-Fields, 98 Mass. App. Ct. 475, 486 (2020) (Henry, J., concurring).

search warrant falls significantly short of the excellent police work we have seen in numerous cases. Accordingly, I dissent.

Discussion. 1. A single controlled "buy" in a drug delivery service case, without more, such as a confidential informant (CI) statement, does not establish the required nexus. The place to be searched at issue here is the defendant's hotel room in Brockton. The CI "had no idea of where [the defendant] was living" and offered no statements tying the defendant's drug activity to this location. Reading the affidavit in support of the search warrant generously, it describes only one controlled "buy" originating from and returning to this location.[2] The majority agrees that "a single observation of a defendant leaving his residence to travel to a controlled buy, standing alone, is insufficient to establish a sufficient nexus to that residence." Ante at . This should be the end of the case.

2. Tacking activity from the apartment does not supply the missing nexus. In denying the defendant's motion to suppress, the motion judge "[c]ombin[ed] the two controlled purchases at the . . . apartment with the third controlled buy" for which the defendant left and returned to the hotel. To find the required

---

[2] The affidavit does not even establish that one controlled buy originated from the hotel room; the reader is left to infer that the defendant left room 205 for the controlled buy. The affidavit states that the affiant "observed [the defendant] exit the rear door of the [four-story] . . . [h]otel" (viz., not a particular room or even floor) to go to the controlled buy.

nexus to permit the search of the defendant's hotel room, the majority also tacks his activity from the apartment to the hotel room. Ante at  . The majority concludes that, "it is a reasonable inference that once the defendant moved from the apartment to the hotel, his room there became his base of operations." Ante at  . This reasoning is not consistent with our case law and is not factually supported by the inadequate affidavit.

a. Case law requires a nexus between the drug activity and the residence to be searched. As the majority acknowledges, ante at  , settled law establishes that there must be a nexus between a specific residence and a defendant's drug activity to obtain a search warrant for that residence. Commonwealth v. Escalera, 462 Mass. 636, 643 (2012); Commonwealth v. Pina, 453 Mass. 438, 440-441 (2009).

While Escalera states that "[a] single observation of a suspect leaving his home for a drug deal may also support an inference that drugs will be found in the home where it is coupled with other information, such as statements from credible informants," Escalera, 462 Mass. at 644,[3] this case is not a case

---

[3] In Escalera, the Supreme Judicial Court relied on two cases to support this proposition. The first case, Commonwealth v. Young, 77 Mass. App. Ct. 381 (2010), is readily distinguishable from this case. In Young, the CI had "repeatedly purchased drugs (once by way of a controlled purchase) from the defendant" (footnote omitted), the defendant

where the CI tied drug activity to the target premises. Moreover, in Escalera, the "other information" was significantly more robust than what we have here and did not involve tacking activity at one residence to another. In Escalera, the affidavit established a nexus to the residence to be searched based on four controlled buys, three of which originated from the residence to be searched, two short transactions near the target residence that were suspected drug sales, and the defendant's return to the target residence after all six suspected drug sales. Id. at 645-646. "The affidavit also provided information that the defendant could deliver drugs in variable quantities on short notice, further supporting the inference that the defendant kept a supply of drugs in his home." Id. at 646. Significantly, in Escalera, the Supreme Judicial Court distinguished the situation we have here, observing that a nexus to permit a search of a residence was "not established where police observed [the] defendant leaving [the] residence for [a] single controlled sale and no other

---

selected locations for purchases "always within walking distance of the defendant's apartment," and the CI had a track record of providing information that led to ten arrests, nine of which resulted in convictions. Id. at 381-383 & n.3. Here, the CI had no track record and the defendant changed his modus operandi. As for the other case, Commonwealth v. Luthy, 69 Mass. App. Ct. 102 (2007), I explained in Andre-Fields why good reason exists to call Luthy into question. See Andre-Fields, 98 Mass. App. Ct. at 490-492 (Henry, J., concurring).

information connected [the] residence to drug activity." Id. at 644-645, citing Commonwealth v. Olivares, 30 Mass. App. Ct. 596, 597-598, 600-601 (1991).

It also is worth noting that in the year after Escalera, in Commonwealth v. Clagon, 465 Mass. 1004, 1007 (2013), the court characterized the nexus to the residence in a drug delivery operation as a "close case," where the police had conducted three controlled buys, at least two of which originated from the target premises and at least one of which terminated at the target premises, and an independent police investigation revealed the defendant's family's ties to the residence and his father's "extensive criminal record involving drug offenses." Id. at 1005-1006.

b. The affidavit did not provide a sufficient factual nexus to the hotel room to be searched. First, assuming the defendant did move his drug sales from the apartment, he changed his method of doing business, which distanced his hotel residence from the drug activity. At the apartment, the defendant was selling drugs in a residence (what the majority infers was likely his residence). After moving to the hotel, he offered a drug delivery service away from a residence. The majority's reliance on Commonwealth v. Young, 77 Mass. App. Ct. 381, 387 (2010), for the proposition that a "defendant's routine of walking directly from his apartment to the point of sale, and

returning to his apartment immediately following the sale, raised a reasonable inference that he kept a cache of drugs in his [residence]," is not persuasive. Here, there is no routine or pattern connected to the hotel. This is not a question of the police having to "start over from a blank slate," ante at . It is a question of nexus to the specific residence to be searched, particularly when the method of operation was different.

Second, the fact that the affidavit is entirely unclear where the defendant lived at the time of the first two controlled buys means there is even less of a nexus to the hotel room. The affidavit never actually says that the defendant lived at the apartment. The CI did not say that the defendant lived at the apartment. The affiant had obtained the defendant's Registry of Motor Vehicle (RMV) record but did not state the address listed for the defendant in it, an omission that is glaring. In fact, the affidavit does not describe any efforts to determine the defendant's address. The affidavit did not describe sufficient surveillance of the apartment to establish that the defendant lived there or even stayed there overnight. See, e.g., Commonwealth v. Tapia, 463 Mass. 721, 724 (2012) (utility bill for apartment was in defendant's name and telephone number associated with account was same number CI called for three controlled buys); Commonwealth v. Matias, 440

Mass. 787, 789 (2004) (police learned from RMV that defendant had registered two vehicles at target location); Andre-Fields, 98 Mass. App. Ct. at 478 ("law enforcement agents conducted intermittent surveillance of [two] addresses associated with [defendant]" and observed defendant's vehicle parked overnight at both locations). It asks too much for the affidavit in support of the search warrant to bear the inference that the apartment was the defendant's residence. If the inference from the affidavit is that the police had no idea of the defendant's residence for the first two controlled buys, then there is less of a nexus to the hotel room.

The police determined that someone else with the same last name, William Lewis,[4] not the defendant, was the tenant at the apartment. And while it is true that the affidavit states that the Brockton Housing Authority officers said William "always has friends and family member [sic] staying with him," the affidavit offered nothing more to indicate that the defendant lived there or was related to William.[5] When the affiant asked a Brockton Housing Authority officer to visit "to see who was in the apartment," the defendant was not in the apartment; rather, the

---

[4] The first name is a pseudonym.

[5] Lewis is one of the most common last names in the United States. See Lewis Family History, https://www.ancestry.com/name-origin?surname=lewis.

officer "encountered" the defendant in the hallway coming to the apartment, and the defendant said he was coming to "visit[]" William Lewis.

In fact, the only reference in the affidavit to the defendant living at the apartment is that the officer learned from an unidentified source -- not the CI -- that the defendant had "moved out of" the apartment. Because we cannot rely on unidentified sources for whom the basis of knowledge and veracity have not been established, see Commonwealth v. Mejia, 411 Mass. 108, 111 (1991), the affidavit is bereft of any claim or evidence that the defendant lived at the apartment.

Moreover, according to the affidavit, on the date of the second controlled buy, the defendant had moved to the hotel (although the police did not observe him coming from the hotel or returning to the hotel from the second controlled buy; rather, the police saw him at the apartment).[6] The affidavit does not give any timeframe for the second controlled buy. Perhaps the defendant resided at the apartment at the time of the second controlled buy, and later moved to the hotel, or he never resided at the apartment at all. The affidavit is silent on these significant facts.

---

[6] The affidavit leaves it to the reader to puzzle out from facts -- set forth pages apart -- that the second controlled buy at the apartment was on the day the defendant checked into the hotel.

The import of the first two controlled buys is that, wherever the defendant lived, the defendant sold drugs at the apartment using a different mode of operation.  None of this provides the required sufficient nexus to the hotel room.

3.  <u>This affidavit was inadequate generally</u>.  Reading a search warrant is an exercise in logic, in which the court draws reasonable inferences from the facts asserted in the affidavit.  See <u>Commonwealth</u> v. <u>Hayes</u>, 102 Mass. App. Ct. 455, 462-464 (2023).  If the court system desires professional policing in the Commonwealth, and I think it does, judges should read these affidavits to determine what they actually show, including reasonable inferences, and fail to show.  We see numerous cases with thorough affidavits that more than support the issuance of a search warrant for residences.  Given the gaping omissions in this affidavit, this is not one of those cases.

As an initial matter, aside from failing to offer any information about the defendant's residence, the affidavit repeatedly uses phrases that should raise a judicial eyebrow. For example, the affiant declares the CI a "Confidential Reliable Informant (C.R.I.)," when the CI's reliability is the very question the issuing magistrate should determine from the facts, and not the affiant's ipse dixit.  This is particularly notable because the affidavit is devoid of the common claim that the CI had previously provided the police with information that

led to the arrest or conviction in prior investigations.  Cf. Commonwealth v. Whitfield, 492 Mass. 61, 63 (2023) (CI "had provided reliable information . . . that had led to numerous arrests for firearms and drug violations"); Young, 77 Mass. App. Ct. at 383 n.3; Commonwealth v. Alcantara, 53 Mass. App. Ct. 591, 593 (2002) (detective "detailed four instances in which CI 19 had provided information that led to search warrants, resulting in arrests and seizures of narcotics").

Similarly, the affidavit says the affiant lost sight of the defendant on his way to the third buy but another detective "observed him seconds later" -- rather than straightforwardly aver whether it was approximately a few seconds, a few minutes, or more.  Without an indication of how many seconds later, the reader is left to infer it was an insignificant number of seconds, and that nothing significant could have happened during that time, such as the defendant dipping into a motor vehicle to retrieve narcotics.  This omission is all the more notable because the affidavit leaves the reader to infer the defendant walked to the controlled buy.  Specifically, the affidavit states that the defendant "walk[ed] towards Frederick Douglas way [sic]" and that "he made his way over towards his predetermined meet location with the C.R.I. . . . " (ellipsis in original).  Given the obfuscatory language in the affidavit

already noted, we cannot infer this is an insignificant change in language.

Besides failing to state how the defendant traveled to the third controlled buy, as indicated in note 2, supra, the affidavit does not establish that the defendant left from room 205 of the hotel to go to the meeting location for the controlled buy.

A third omission is that the affidavit does not state how much time had passed between the time of the CI's call and the purchase meeting. Cf. Escalera, 462 Mass. at 639 (in each of four controlled buys defendant arrived at designated location within several minutes of CI's call). Again, the reader is left to infer that it was an insignificant amount of time that did not allow the defendant to obtain narcotics elsewhere.

Fourth, while police had the apartment under surveillance, they did not report observing other activity consistent with drug transactions. See, e.g., Commonwealth v. O'Day, 440 Mass. 296, 299 (2003) (several vehicles parked in front of defendant's residence and in his driveway as well as visitors arriving and departing after "brief stay" observed during surveillance, in trooper's opinion, "was consistent with narcotics distribution"); Commonwealth v. Parapar, 404 Mass. 319, 321 (1989) ("During surveillance of the Auburn Street building, two troopers observed numerous people enter the building and leave a

short time later. The troopers opined, based upon the amount of traffic at the location, that there was a large scale drug operation there"); Commonwealth v. Paredes, 35 Mass. App. Ct. 666, 667 n.1 (1993) ("The motion judge found that the police investigation included . . . surveillance and observation of heavy 'traffic activity [that] was consistent with a drug distribution operation' at the premises"). The majority infers the apartment was the defendant's "base of operations," ante at , from one controlled buy when the defendant may or may not have lived at the apartment (the first controlled buy) and one controlled buy on a day the affidavit establishes the defendant checked into the hotel (the second controlled buy).

Fifth, the affiant does not use telephone records to link the telephone number the CI called to the defendant. See, e.g., Matias, 440 Mass. at 789 (police subpoenaed records for cell phone number supplied by CI to determine to whom it was registered and billing address); Commonwealth v. Monteiro, 80 Mass. App. Ct. 171, 172 (2011) (police investigation linked telephone number called by CI to electric utility records billed to defendant's wife at address police sought to search).

Sixth, the affiant does not say the defendant stayed in the same hotel room during his entire stay at the hotel. To the contrary, the affidavit was written in a way to suggest the defendant may have moved rooms. It states that three days after

the third controlled buy, on May 1, 2019, the affiant confirmed with a front desk clerk at the hotel that the defendant "checked into the hotel on April 26, 2019 and is currently staying in room #205."

In sum, this is a case where the affidavit's substantive omissions and imprecise language are so overwhelming that common sense and reasonable inferences cannot permissibly fill the numerous gaps.

Conclusion.  Nothing in this case justifies the majority's departure from settled case law that requires a residence-by-residence approach, particularly based on such a woefully inadequate affidavit.  I dissent.